## BERKSHIRE LAND CO. v. FEDERAL SECURITY CO.

### No. 10537.

United States Court of Appeals
Third Circuit.
Argued Jan. 22, 1952.
Reargued Sept. 8, 1952.

Decided Oct. 17, 1952.

Kalodner, Circuit Judge, dissented.

Grover C. Ladner, Philadelphia, Pa. (Alexander J. Barron, Alter, Wright & Barron, Pittsburgh, Pa., John R. Young, P. Nicholson Wood, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., on the brief), for petitioner.

John E. Laughlin, Jr., Pittsburgh, Pa. (Joseph E. Madva, Thorp, Reed & Armstrong, Pittsburgh, Pa., on the brief), for respondent.

Before BIGGS, Chief Judge, KALODNER, Circuit Judge, and STEWART, District Judge.

BIGGS, Chief Judge.

The plaintiff, Berkshire Land Company, a Pennsylvania corporation, by its complaint filed May 13, 1949, against the defendant, Federal Security Company, a Delaware corporation, seeks to have satisfied of record a mortgage which became due September 19, 1916 and an adjudication that the debt for which the mortgage was security has been paid. The amount of the mortgage was $200,000 and jurisdiction is based upon diversity of citizenship. The complaint was dismissed with prejudice and Berkshire has appealed.[1]

It is not disputed that the mortgage became due on the date stated or that it still stands as a lien of record against certain undivided interests in coal rights in Greene County, Pennsylvania, now owned by Berkshire.[2] Federal is the assignee of the mortgage under an assignment dated May 1, 1922 and recorded May 10, 1922. The mortgage was executed on September 19, 1914 by Thompson, Berkshire's predecessor in ownership to the coal. The mortgage by its terms became due and payable two years after the date of execution.

---

1. The court below filed findings of fact and conclusions of law, 98 F.Supp. 4, but did not hand down an opinion.

2. No bond was offered in evidence.

█ Berkshire bases its demand for satisfaction of the mortgage on the presumption of payment which arises in Pennsylvania when twenty years have passed since the due date of a bond or specialty. The principle involved was well expressed by the Supreme Court of Pennsylvania in Gregory v. Commonwealth, 121 Pa. 611, 621–622, 15 A. 452, 453, as follows: "All debts excepted out of the statute of limitations, unclaimed and unrecognized for 20 years, in the absence of sufficient explanatory evidence, are presumed to have been paid. This presumption is an artificial and arbitrary rule of the law, derived by analogy from the English statute of limitations. It originated in equity, but was afterwards engrafted into the common law, and has since been steadily maintained. It is not, like the statute of limitations, a bar to an action on the original contract, therefore, a new promise is not necessary to sustain the suit. Any competent evidence, which tends to show that the debt is in fact unpaid, is admissible for that purpose." The substance of the rule was well put by Mr. Justice Brown in Fidelity Title and Trust Company v. Chapman, 226 Pa. 312, 314, 75 A. 428, 429, when he said, "This presumption, in the nature of a receipt written by the hand of time, may, however, be overcome by affirmative proof that the debt as a matter of fact has not been paid * * *".

Here, Berkshire bases its case on two alternative positions: (1) the *prima facie* presumption of payment has not been rebutted, and (2) the debt *has* been paid. To this attack Federal interposes two defenses: (1) that the presumption of payment is not here applicable because the presumption may serve as a shield but not as a weapon of attack, and (2) that it, Federal, has carried the burden of proof required to rebut the presumption of payment. It should be noted that if Federal has proved the fact of nonpayment not only is the presumption rebutted but also Berkshire's claim for relief based on payment must fall.

█ As to the first defense asserted by Federal, namely that the presumption of payment is not applicable because it cannot serve as a weapon of attack, it must be conceded, on analogy to the statute of limitations, that the argument carries some weight and there are Pennsylvania cases which support Federal's position. See Louchbaum's Estate, 7 Pa.Dist.R. 100 (Orphans' Court, Franklin County, 1897) and Sprowles' Estate, 15 Pa.Dist. & Co. 440 (Orphans' Court, Philadelphia County, 1931).[3] But it has been repeatedly stated by the Supreme Court of Pennsylvania that the legal presumption of payment after 20 years, in the case of a bond or specialty, does nothing more than shift the burden of proof. See, for example, the opening sentence in the opinion in Re Devereux's Estate, 184 Pa. 429, 39 A. 225. The question is one of fact in a suit to quiet title. Such is really the nature of the litigation at bar. The "shield not sword" doctrine should not be applied where the question is really one of the weight of the evidence.

██ We are not bound by the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, or that of Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, to apply the doctrine laid down in the two Orphans' Court cases referred to in the preceding paragraph under the circumstances of the case at bar. See Sunbeam Corp. v. Civil Service Employees' Coop. Ass'n, 3 Cir., 187 F.2d 768, 771–772. The Orphans' Courts of the several Pennsylvania Counties are not common law courts but tribunals of limited jurisdiction. See In re Brereton's Estate, 355 Pa. 45, 55, 48 A.2d 868, 873. Orphans' Courts are of a grade and rank like unto the Courts of Common Pleas of Pennsylvania. In re Hohein's Estate, 265 Pa. 14, 18, 108 A. 173, 174. A single Orphans' Court decision can be disregarded by another Orphans' Court of the Commonwealth of Pennsylvania and we conclude, therefore, that the two decisions

---

**3.** The Act of June 10, 1881, P.L. 97, § 1, 21 P.S.Pa. § 688, has no bearing in the instant case for its operation has been suspended. 21 P.S.Pa. § 688. See Rule 1455, Pa.R.C.P. 12 P.S.Appendix.

In any event the right to satisfaction depends upon the general law. See Richards v. Walp, 221 Pa. 412, 414, 70 A. 815, 816.

of Orphans' Courts of the Commonwealth cited above, decisions widely separated as they are in time and space, also are not binding upon United States courts in the Commonwealth. See King v. Order of United Commercial Travelers of America, 333 U.S. 153, 68 S.Ct. 488, 92 L.Ed. 608. Accordingly we conclude that the first defense interposed by Federal falls.

■■ Is the second defense asserted by Federal valid? When Berkshire proved the existence of a mortgage unsatisfied of record and payment due in 1916 it made out a *prima facie* case. See Reed v. Reed, 46 Pa. 239, 242–243, and Gregory v. Commonwealth, supra, 121 Pa. at page 622, 15 A. at pages 453–454. The burden of proof thereby was shifted to Federal and the question then became whether or not Federal carried the burden of proof required to rebut the presumption of payment. To answer this question requires an examination into the nature of the proof necessary under Pennsylvania law to overcome the presumption of payment, and an analysis of the testimony offered by the parties.

The most recent full exposition of the law applicable to the case at bar appears in the opinion of Mr. Justice Horace Stern in In re Grenet's Estate, 332 Pa. 111, 113–114, 2 A.2d 707, 707–708. Mr. Justice Stern stated: "The presumption of payment arising from lapse of time does not work an extinguishment of the debt, nor, unlike the bar of the statute of limitations, does it require a new promise or its equivalent to revive it. It is a presumption merely of fact, and amounts to nothing more than a rule of evidence which reverses the ordinary burden of proof and makes it incumbent upon the creditor to prove, by preponderance of the evidence, that the debt was not actually paid. This burden may be met by direct testimony as to non-payment, or by proof of circumstances tending to negative the likelihood of the claim having been satisfied and explaining the delay of the creditor in attempting to enforce it,—for example, that there existed a relationship between the parties which would account for the failure of the creditor to insist upon collection, that the debtor's financial condition was such as would have prevented his paying the debt, that the bond, note or other instrument upon which the claim rested remained at all times in the creditor's possession, that the creditor had died and, no administrator being appointed, there was no one to whom payment legally could have been made. These and similar circumstances, while not, singly or collectively, conclusive, are admissible in evidence for the purpose of rebutting the presumption of payment." This view was reiterated with approval by the same court only last year in In re Snyder's Estate, 368 Pa. 393, 396–397, 84 A.2d 318, 320–321.

■ It will be noted that alternative methods of rebutting the presumption of payment are specified: "direct testimony as to non-payment," *or* "proof of circumstances tending to negative the likelihood of the claim having been satisfied" accompanied by some explanation of the creditor's failure to enforce his claim. These alternatives have long been part of the Pennsylvania law dealing with this presumption, Reed v. Reed, supra, 46 Pa. at page 242, and we understand them to mean that an explanation of the creditor's delay in enforcing his claim is required only when no direct evidence of nonpayment is available.[4] Direct evidence of nonpayment renders such an explanation, with its resulting inference of nonpayment, unnecessary. This view is fortified when we remember that the issue in these cases is payment, not the negligence of the creditor in failing to collect his debt promptly. See Chesapeake & Delaware Canal Co. v. United States, 3 Cir., 240 F. 903, 908, affirmed 250 U.S.

4. Appellant contends that Russo v. Roberts, 331 Pa. 173, 200 A. 76, requires an explanation of the creditor's delay even where there is direct evidence of nonpayment. This case was decided prior to the Grenet case, and we do not think that it supports appellant's contention. Although in Russo the presumption of payment was held not to have been overcome despite the fact that the creditor's evidence of nonpayment was not contradicted, this evidence was not convincing to the jury and did not adequately cover all the circumstances under which payment might reasonably have been made.

123, 39 S.Ct. 407, 63 L.Ed. 889. Tardiness is sufficiently penalized, and the debtor's burden in opposing a stale claim sufficiently eased, by the imposition upon the creditor of the task of proving nonpayment by a preponderance of the evidence.

We must therefore review the testimony to determine whether the defendant here has sustained, under one or both of the above alternatives, the burden of proving nonpayment. Since the judgment of the court below, the trier of facts, was for Federal, every permissible inference from the testimony must be taken in Federal's favor. Thompson, the mortgagor and first owner of the coal,[5] gave the mortgage to Stone in September 1914 to cover a number of past and prospective obligations in Stone's favor. Thompson then was president of the First National Bank of Uniontown, Pennsylvania. Stone was a vice-president, a director and stockholder of the Citizens Title and Trust Company, also of Uniontown. Thompson and his bank were then in financial difficulties and Stone was interested in Thompson's financial welfare for obligations of the First National Bank of Uniontown were held by Stone and the latter feared a run on the bank. Stone and Bortz were in a partnership, W. A. Stone & Co., which owned and operated coal properties. Stone and Bortz also owned controlling interests in Prospect Coal and Coke Company which had bought coal lands from Thompson and on which mortgages given by Thompson were then outstanding. Stone had endorsed notes of Thompson and of the First National Bank. We think it is clear that Stone took the 1914 mortgage, the subject of the present litigation, as security.

Early in 1915 the First National Bank failed and in 1917 Thompson was adjudicated a bankrupt. Throughout this period Thompson was in great financial difficulties and various holders of notes given by him demanded partial assignments of the mortgage with which we are concerned as well as Stone's endorsements of Thompson's notes. Some of Thompson's creditors demanded new notes which were supplied by W. A. Stone & Co. That partnership paid off such notes as had been endorsed by Stone as they matured and also the new notes given by W. A. Stone & Co. as they also fell due. Stone in turn received reassignments of those "portions"[6] of the mortgage which he had assigned as security. In 1922 Stone again held the whole mortgage interest.

The record contains no evidence as to whether Thompson was discharged of his debts or whether any disposition was made of the mortgage obligation in the bankruptcy proceedings.[7] It is undisputed that in 1922 Stone was pressing for some kind of settlement of the obligations which Thompson owed him and W. A. Stone & Co. A meeting was held in Thompson's office in order to discuss his liabilities. Bortz, testifying by deposition, stated that he was at this meeting and that during the course of it Thompson paid to Stone or to W. A. Stone & Co., or both of them, the full amount of the indebtedness secured by the mortgage. But on cross-examination this testimony was almost demolished.[8] Moreover, Bortz was only positive that Thompson delivered a check and that Stone delivered the mortgage in exchange. He had no clear conception as to what was the extent of Thompson's then existing obligations to Stone but he was of the opinion that Thompson was indebted to W. A. Stone & Co. to the extent of about $50,000. He did not know the amount of the check which he said was delivered, who was the drawer, drawee or payee, or even whether Thompson was representing himself at the meeting. He did produce a bank deposit book of W. A. Stone & Co. used only as

5. The chain of title is not disputed.

6. See testimony of Bortz, Joint Appendix, p. 21a.

7. The absence of such evidence is also unexplained, but we do not remand for testimony upon this point for in the view we take such evidence, if available, becomes immaterial.

8. Bortz was asked: "Well, then, is this correct, Mr. Bortz, that all you know of your own knowledge about this transaction with Mr. Thompson was that W. A. Stone and Company got fifty thousand dollars?" Bortz answered, "Yes."

"an office memo." [9] which showed an entry of $50,000 to the credit of W. A. Stone & Co. from Thompson dated May 26, 1922.

Seifert, a member of the Bar of Allegheny County, who was a stockholder and treasurer [10] of Federal, testified that A. A. Thompson, the son of Thompson the mortgagor, was then the principal stockholder of Federal; that A. A. Thompson had an option to buy certain of the coal rights against which the mortgage was a lien; that A. A. Thompson wanted to help his father, who could not meet the mortgage debt; and that he also desired the optioned lands to be freed from possible foreclosure as threatened by Stone. Seifert's position was that A. A. Thompson thought that the mortgage should be taken by Federal as an investment, and though he, Seifert, did not think it was a very good investment he agreed nonetheless that the mortgage should be purchased from Stone by Federal. To this end he prepared assignments of the bond and mortgage to be executed by Stone in favor of Federal together with additional assignments to be executed by Thompson, the mortgagor. Seifert also testified that he prepared a check [11] for $51,500 drawn upon Federal's funds to the order of Stone and that he turned all the papers and documents over to A. A. Thompson. The check for $51,500 signed by Seifert as Federal's treasurer was drawn on a Cleveland or a McKeesport bank and was made payable to Stone's order.

The record contains evidence the mortgage was not paid prior to the meeting in 1922. There was proof Thompson was not in a position to pay. In addition the relationship of father and son existing between Thompson the mortgagor and A. A. Thompson aids in explaining why payment was not pressed by Federal after acquisition. The existence of the assignments is, we think conclusive of the question of payment. One does not assign a paid bond or mortgage. If the assignments from Stone to Federal occurred after the payment alleged to have been made by Bortz, fraud or mistake must be presumed unless we attribute to Federal a desire to buy a valueless paper for $51,500. If the assignments were executed before the payment to Stone, the payment would have been improper and ineffective for all of the parties were aware that Federal as assignee had succeeded to the right to payment. It is very reasonable to conclude, as did the court below, that the assignments and payment to Stone were substantially simultaneous and constituted a purchase by Federal of Stone's rights in the mortgage. Seifert identified the recorded assignments of the bond and mortgage from Stone to Federal as being those he had prepared and he identified also the unrecorded assignments from Thompson, the mortgagor, which were witnessed by A. A. Thompson.[12] Seifert testified that the mortgage had been in Federal's possession since Stone executed the assignments and he expressed the conclusion that Thompson, the mortgagor must have represented Federal at the settlement, paid Stone with its check and delivered the mortgage to Federal. The court below accepted his evidence and embodied it in appropriate findings of fact.[13]

9. The deposit book is in evidence as plaintiff's exhibit No. 1, and, concededly, it does not contain all of the deposits made by W. A. Stone & Co.

10. Seifert stated he might also have been president of Federal.

11. The check was not produced in evidence and testimony as to its contents was objected to as not being the best available. No explanation for nonproduction was given. But the assignments were the best evidence of purchase, and these were produced. The check was collateral thereto, only a means of purchase. See McCullough v. Holland Furnace Co., 293 Pa. 45, 51, 141 A. 631, 633; Delvit-

to v. Schiavo, 164 Pa.Super. 338, 343–344, 64 A.2d 496, 499; Pecoraro v. Pecoraro, 105 Pa.Super. 543, 161 A. 591.

12. These unrecorded assignments are in evidence as defendant's exhibits D and E.

13. See Joint Appendix, pp. 256a–257a, as follows:

"14. On May 26, 1922, Thompson handed a check in the sum of approximately $50,000.00 to Stone, in the presence of Bortz. This check was not introduced in evidence. The available documentary evidence and depositions, however, lead me to the determination that this check was the identical check for $51,500.00, which was signed by one

Seifert testified also that he had had the assignment duly recorded on May 10, 1922; that he had retained the mortgage as treasurer of Federal in his possession from 1922 until 1937 when he had delivered it to A. A. Thompson; that Seifert then went out of office and A. A. Thompson succeeded him as the custodian of Federal's securities; that Seifert turned over the assignments to A. A. Thompson, and that prior to the delivery of the mortgage and the assignments by Seifert to A. A. Thompson these papers had been kept in a safe deposit box in the Union Trust Company of Pittsburgh. Seifert further testified that during the period between the acquisition of the mortgage and the assignments in 1922 until the termination of his connection with Federal in 1937 no payment was received by Federal of the principal or interest of the mortgage. The parties have stipulated that no payment has been received by Federal since 1937. Moreover, it has been agreed by the parties that on December 30, 1941 and April 6, 1944, respectively, deeds were executed by Berkshire covering interests in the coal rights. These deeds recited the existence of the mortgage and the scrivener carefully excepted the grantees thereunder from any liability for the mortgage. This we think is some additional evidence that the subsisting debt was in existence as late as April 6, 1944.[14]

To test the evidence in the instant case against the principles expressed in the Grenet decision it is convenient to divide the period covered into three sections: (1) from maturity of the mortgage until its acquisition by Federal in 1922; (2) from 1922 until 1937 when Seifert ceased to be an officer of Federal; and (3) from 1937 until the institution of this suit. We have no difficulty in holding that defendant has proved nonpayment in the period between 1922 and 1937. Seifert's testimony, which the court below regarded as credible and comprehensive, is direct evidence of this, and in the view we take of the Grenet decision defendant is thus not required to furnish an explanation of its failure to enforce the mortgage during this period. There is also no difficulty in establishing nonpayment following 1937. The parties have stipulated that no payment was made. The disputed evidentiary problem is whether defendant has sufficiently accounted for the period prior to the acquisition of the mortgage by Federal in 1922.

Plaintiff urges that the record contains no direct evidence that the mortgage was not paid prior to the meeting between Bortz, Thompson and Stone in 1922. Even accepting this view, we hold that there was ample indirect evidence of nonpayment, and of the mortgage holder's reasons for not enforcing his claim, to establish by a pre-

William A. Seifert, as treasurer of defendant, was drawn on a Cleveland or McKeesport bank, and was made payable to the order of Stone."

"15. Stone and Bortz treated the check as discharging all debts which Thompson owed the W. A. Stone and Co. firm and which had been secured by the 1914 mortgage. Stone simultaneously handed Thompson the mortgage."

"18. The available documentary evidence and depositions convince me that defendant prepared the two Stone and the two Thompson assignments at about the same time, and that execution of the four instruments was part of a plan whereby defendant succeeded to all unsatisfied mortgagee rights."

14. We have encountered some small difficulty in this case due to the fact that both Bortz's and Seifert's testimony was taken by deposition and neither witness appeared before the trial court. If there had been substantial conflict in their tes-

mony we would have had difficulty in perceiving how the trial court could have determined the truth as expressed in one deposition rather than in the other. Cf. Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 130 F.2d 1016, 1022; Frederick Hart & Co., Inc., v. Recordgraph Corp., 3 Cir., 169 F.2d 580, 581, and Sarnoff v. Ciaglia, 3 Cir., 165 F.2d 167, 168. But little efficacy remained in Bortz's testimony after his cross-examination while that of Seifert is corroborated by the potent evidence of the assignments which are physically in the record. Bortz's evidence in unconvincing.

In making this statement we do not intend to reflect on his veracity. We merely point out that a long time has elapsed between the meeting in 1922 and taking of the evidence by deposition in 1950. Anyone accustomed to handling witnesses and testimony is aware of the difficulties in recollecting events which transpired some twenty-seven years before.

ponderance of the evidence that the mortgage had not been paid prior to the meeting and to the acquisition of the mortgage by Federal. For several years following the giving of the mortgage Thompson was in bad financial condition, a condition which led to bankruptcy; it was in Stone's interest during this time to assist Thompson as best he could; Thompson's trustee in bankruptcy listed the mortgage as a liability; following Thompson's bankruptcy Stone continued to retain possession of the mortgage; Stone in fact was pressing for payment in the months just prior to May, 1922; and finally, as we have stressed above, the mortgage was assigned for a valuable consideration and the assignments recorded. We think the court below did not err in its conclusions, the first implicit, the second, expressed that the debt was not satisfied prior to the execution of the assignments and that Federal succeeded "to all unsatisfied mortgagee rights".[15] The inferences, as we have pointed out, were for the court below, the trier of facts. "Whether the proof is ample to rebut the presumption of payment must necessarily depend on the particular circumstances of each case, and it is primarily for the court to decide whether the facts, if true, are adequate for the purpose for which offered, * * *." Sheafer v. Woodside, 257 Pa. 276, 281, 101 A. 753, 754, 1 A.L.R. 775.

We conclude, therefore, that the second defense asserted by Federal is valid, that it has carried the burden of proof to rebut the presumption of payment, and that it has in fact proved nonpayment within the purview of Grenet's Estate.

Accordingly, the judgment of the court below will be affirmed.

KALODNER, Circuit Judge (dissenting).

15. See again finding of fact No. 18, quoted in Note 13, supra.

1. The Complaint in Paragraph 1 alleges the fact of dissolution on October 25, 1948, and the defendant's Answer to Paragraph 1 admits the allegation.

2. "There is a long established presumption that a mortgage * * * unclaimed and unrecognized for 20 years, has been paid.

It is well · settled under the Pennsylvania decisions that "whether the facts and evidence relied upon to rebut the presumption of payment are true is a question of fact for the jury; but whether, if true, they are sufficient to rebut the presumption, is a question of law for the court." Corn v. Wilson, 1950, 365 Pa. 355, 358–359, 75 A.2d 530, 532. I do not believe that the record and the evidence sustain the conclusion of law of the District Court that the defendant had successfully rebutted the presumption of payment.

Unfortunately, the District Court did not write an opinion but merely stated its findings of fact and conclusions of law. They contain no mention of what I deem to be a critical fact—that the defendant corporation dissolved on October 25, 1948,[1] without having ever made any demand upon the plaintiff for payment of the $200,000 mortgage which is the subject of this litigation. Inescapably, this significant fact speaks volumes. The defendant corporation at the time of its dissolution in 1948 had held the mortgage for 26 years (since 1922). During that time it never made any demand for payment and it dissolved without making any demand for payment or taking any action towards payment. It is inconceivable that a corporation holding a $200,000 mortgage would dissolve without attempting to liquidate such an asset if a valid claim existed with respect to it.

The majority in its opinion gave no consideration at all to this vitally important factor of dissolution without any attempt at collection of the mortgage. It should have done so, particularly under the requirement of the applicable Pennsylvania decisions that the defendant must "sufficiently" account for its delay in securing payment, particularly where, as here, it had held the mortgage for 26 years.[2]

* * * This presumption of payment after a lapse of 20 years is a strong one and is favored in law as tending to the repose of society, the protection of the debtor, and the discouragement of stale claims. * * * The presumption of payment may be rebutted only by clear, satisfactory and convincing evidence beyond that furnished by the specialty itself, that the debt has not been paid, or

In connection with this litigation it must be kept in mind that the mortgage was created in 1914 for a two year term and payment was consequently due thereon in 1916; that no extension agreement with respect to the mortgage was ever executed so that when the defendant acquired the mortgage in 1922, it had been in default at that time for six years and at the time the defendant dissolved in 1948, it had been in default for 32 years. Further, it must be noted that the defendant not only failed to make any demand for payment during the 26-year period in which it held it (from 1922 to 1948), but never made any demand after dissolution. Indeed, had it not been for the fact that the plaintiff instituted this action on May 13, 1949, (more than six months after dissolution), seeking a decree that the mortgage be cancelled, the question as to the payment of the mortgage would not now be before us.

In my opinion, the defendant has failed to meet its burden, under the Pennsylvania decisions, to rebut the presumption of payment.

For the reasons stated I would reverse.

by proof of circumstances tending to negative the likelihood of payment and *sufficiently accounting for the delay of* *the creditor.*" (Emphasis supplied.) Corn v. Wilson, 1950, 365 Pa. 355, 358, 75 A.2d 530, 532.